CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
August 08, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| AUBREY C.,[1] | ) | |
| | ) | Civil Action No. 7:23-CV-00473 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | |
| Commissioner of Social Security, | ) | By: C. Kailani Memmer |
| | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Aubrey C. ("Aubrey") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. This case is before me by referral. Neither party requested oral argument; therefore, this case is ripe for decision. For the reasons detailed below, I respectfully recommend that the presiding District Judge **AFFIRM** the Commissioner's final decision and **DISMISS** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Aubrey failed to demonstrate that he was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. §

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

On January 9, 2020, Aubrey filed an application for DIB, alleging disability beginning on March 7, 2019. R. 18. The Commissioner denied Aubrey's claim initially and on reconsideration. R. 217–44, 254–59. On November 29, 2021, Aubrey requested a hearing before the ALJ. R. 260.

---

423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. § 423(d)(2).

On May 19, 2022, Aubrey appeared by telephone before the ALJ Joseph T. Scruton. R. 18. Patricia Posey testified at the hearing as an impartial vocational expert. *Id*. On September 8, 2022, the ALJ entered a decision analyzing Aubrey's claims under the familiar five-step process[4] and denying his request for benefits. R. 18–33.

At the first step, the ALJ found that Aubrey had not engaged in substantial gainful activity since March 7, 2019, the alleged onset date. R. 21. At the second step, the ALJ found that Aubrey has the following severe impairments: pseudo non-epileptic seizure disorder; stable syringomyelia/syrinx of the thoracic spine; obesity; generalized anxiety disorder; and bipolar, conversion, and somatic disorders. *Id*.

As to the third step, the ALJ found that Aubrey's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 21–24. The ALJ specifically considered Aubrey's obesity, along with Listings 11.02 (epilepsy), 1.15 (compromise of a nerve root), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.07 (somatic symptom and related disorders). *Id*. In considering the "paragraph B" criteria regarding Aubrey's mental impairments, the ALJ found that Aubrey has no limitations in understanding, remembering, or applying information, and moderate limitations in interacting with

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); *Heckler v. Campbell,* 461 U.S. 458, 460-62, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

others; concentrating, persisting or maintaining pace; and adapting or managing oneself. R. 22–

24.

The ALJ concluded Aubrey retained the residual functional capacity ("RFC") to:

perform light work as defined in 20 CFR 404.1567(b) except the claimant can never crawl or limb ladders or scaffolds. He can frequently, but not constantly, handle and finger bilaterally. He can have no exposure to hazards, such as heavy machinery and unprotected heights, and can have no driving requirements. He has concentration, persistence, and pace adequate for performing simple, routine (non-complex) tasks. He can occasionally interact with supervisors and coworkers but can have no requirements for public interaction. Due to the overall impact of his impairments, he may fall off-task up to 15% of the workday apart from regularly scheduled breaks and may incur up to two days per month unscheduled absences.

R. 24.

At the fourth step, the ALJ found that Aubrey is unable to perform any past relevant work.

R. 32. At step five, the ALJ determined that Aubrey could perform jobs that exist in significant

numbers in the national economy, such as pricer, sorter, and folder. R. 33. Thus, the ALJ concluded

a finding of "not disabled" was appropriate. *Id*. Aubrey appealed the ALJ's decision, and on June

6, 2023, the Appeals Council denied his request for review. R. 1–7. This appeal followed.

## FACTS

### A.  Aubrey's Background and Testimony

At the time of the May 19, 2022 hearing, Aubrey was 24 years old. R. 52. Aubrey graduated

from high school. *Id*.

Aubrey testified he started experiencing seizure episodes in 2018. R. 59. Aubrey

experiences on average one to four seizures per month. R. 53. There are some months where he

may experience more and others where he does not have any seizures. *Id*. He testified that he falls

down, shakes, and "lose[s] his judgment" when he has a seizure episode. R. 53, 55. He can tell

when a seizure spell is coming on, but it can still result in him falling and hitting his head. R. 53–

54. It is common for Aubrey to experience more seizures soon after he has one seizure episode. R.

4

55. Aubrey testified that after he experiences one or more seizures, he is very tired and fatigued which results in him sleeping for the rest of the day. *Id*.

When Aubrey worked at Volvo, he would attempt to tell other employees when he thought a seizure episode was about to occur. R. 54. When a seizure episode occurred at Volvo, it was common for him to be transported to the hospital. *Id*. On one occasion, six men at Volvo held him down when he had a seizure. R. 55.

Aubrey testified that stress causes his seizures, including routine, stressful matters such as interactions with family members, but it can also occur after a "big, stressful situation." R. 57. For example, interactions with his grandfather upset Aubrey to the point he experienced a seizure episode. R. 64. Aubrey is working on managing himself better in terms of coping and his mental health to avoid stress. R. 58. He confirmed his seizure diagnosis has improved since 2020. *Id*.

Aubrey testified he is diagnosed with bipolar. R. 58. Aubrey stated he had "one or maybe two" suicide attempts. *Id*. Aubrey claimed, "a lot of these things started when [he was] working at Volvo," including seizures, panic attacks, insomnia, and anxiety issues. R. 58–59. He did not experience seizures when he was a teenager or when he was in school. R. 58.

Aubrey testified he has good days and bad days. R. 59. On a bad day he stays inside, lays down a lot, and does not really do anything. *Id*. On a better day, he still spends a portion of his day laying down due to fatigue. *Id*. He believes his lack of sleep, from insomnia and/or sleep apnea, causes his fatigue during the day. R. 60. Even on a good day, if Aubrey attempts to do a routine chore for an hour, he has to lay down for a period of time. *Id*. Aubrey testified he experiences obsessive-compulsive tendencies on a day-to-day basis which can affect his focus and concentration. R. 61–62. Aubrey claimed he has anger and explosive tendencies causing him to "get upset easily" and "fly off the handle" when communicating with family members. R. 62.

As for daily activities, Aubrey cleans his house, but has to lay down for an hour or two after cleaning for one hour. R. 68. If Aubrey is having a "bad" day, he does not clean his house. *Id*. Aubrey also mows and weed-eats his yard. R. 71. On a typical day, Aubrey wakes up between 9:00am to 9:30am. R. 72. He will talk on the phone with his neighbor, best friend or parents, watch TV, work on household chores, wash clothes, and view social media, such as Facebook, Instagram, TikTok, and other social media outlets. *Id*. Aubrey testified he still has his driver's license and on a "good day" will drive to the grocery store and pharmacy and will sometimes "drive around the block." *Id*.

### B. Medical History Overview

Aubrey claims disability primarily due to his generalized anxiety disorder, bipolar disorder, and somatoform/conversion disorder with pseudoseizures.[5]

On June 4, 2018, Aubrey presented to the care of his primary care provider, Matthew S. Kaatz, M.D., at New River Medical Group for a follow up regarding his major depressive disorder, bipolar, generalized anxiety, and insomnia. R. 473. Dr. Kaatz noted Aubrey was in denial of his bipolar diagnosis and was not taking his prescribed medication. *Id*. Upon physical examination, Aubrey was noted to be sitting comfortably and making eye contact, exhibited blunted range of affect, depressed mood, and interacted appropriately at baseline. *Id*. Dr. Kaatz stressed the need for Aubrey to accept his diagnosis, take his medicine to get better and make progress to improve his life. *Id*. Aubrey was prescribed Cymbalta, Abilify, and Zoloft, and was told to follow up in one month. *Id*.

---

[5] As Aubrey's arguments focus on his diagnoses of generalized anxiety disorder, bipolar disorder, and somatoform/conversion disorder with pseudoseizures, I limited the medical history overview to these medical conditions.

On August 10, 2018, Aubrey had a follow-up appointment with Dr. Kaatz regarding his bipolar diagnosis. R. 471. Aubrey was noted to be taking his bipolar medication regularly and was "doing really well" as his mood had been stable. *Id*. Upon physical examination, Aubrey was sitting comfortably, made good eye contact, had a good range of affect and good mood, and interacted appropriately. *Id*. Aubrey was continued on his medication, with Dr. Kaatz noting to "[l]eave well enough alone" and for Aubrey to follow up in three months. *Id*.

On August 24, 2018, Aubrey presented for an appointment with Dr. Kaatz regarding acute dizziness provoked by position change with some left ear pain and history of bilateral cerumen impactions in the past. R. 470. Aubrey had not experienced recurring headaches, migraines, seizures, loss of consciousness, loss of balance, or numbness. *Id*. Dr. Kaatz noted he believe Aubrey's dizziness was related to serous otitis as pulse lavage provoked symptoms. *Id*. Aubrey was advised to continue his medications and follow up in November as scheduled. *Id*.

On November 12, 2018, Aubrey presented for a follow-up appointment with Dr. Kaatz regarding his bipolar disorder. R. 469. Upon physical examination, Aubrey was sitting comfortably, made good eye contact, had a full range of affect with a good mood, and interacted appropriately. *Id*. Dr. Kaatz noted Aubrey had pretty good insight into his illness and was stable on his medicines. *Id*.

On December 21, 2018, Aubrey presented for a follow-up appointment with Dr. Kaatz regarding his bipolar disorder. R. 467. Dr. Kaatz noted Aubrey's bipolar improved, but he still experienced some anxiety and irritability. *Id*. To quell these symptoms, Dr. Kaatz prescribed Valium. *Id*. Aubrey also experienced sinus congestion and drainage consistent with early sinusitis for which Dr. Kaatz prescribed Flonase nasal spray and Zithromax. *Id*. Aubrey was advised to "[f]ollow up in three weeks re-assess." *Id*.

On January 8, 2019, Aubrey presented to Lewis Gale Hospital due to a seizure-like episode. R. 816. Testing was normal and he was discharged with the advice to avoid working from heights, operating heavy machinery, and no driving until cleared by neurology. *Id*.

On January 9, 2019, Aubrey presented for an ER follow up with Dr. Kaatz. R. 468. Dr. Kaatz assessed Aubrey as experiencing a "[p]robably panic attack with conversion/reaction pseudoseizure." *Id*. Aubrey was advised to seek further evaluation and management with a neurologist and to stay out of work for a week. *Id*. Aubrey was continued on Lamictal and Zoloft. Dr. Kaatz noted Aubrey was not taking Valium regularly as prescribed. *Id*. Aubrey was advised to follow up in one week. *Id*.

One week later, Aubrey presented for a follow up appointment with Dr. Kaatz regarding his bipolar and "what looked like pseudoseizures." R. 466. Dr. Kaatz noted Aubrey was "doing fairly well," as his symptoms seemed to improve, although he continued to experience dizzy spells that would come and go. *Id*. On one occasion, Aubrey reported he had a headache that degenerated into a dizzy spell which he was able to sleep off at home, with no resulting injury or fall. *Id*. As for Aubrey's bipolar disorder, Dr. Kaatz noted such disorder improved with current medication and continued him on the same medication regimen. *Id*. Dr. Kaatz noted Aubrey's spells were akin to pseudoseizures and ruled out seizure disorder, advised Aubrey to follow up in two weeks to re-assess, and to remain out of work during that time. *Id*.

Aubrey had follow up appointments with Dr. Kaatz for bipolar disorder and seizure-like episodes in January and March 2019. R. 463–65. In late-January 2019, Aubrey's bipolar disorder improved with medication as he noted he felt better and was more relaxed and stable. R. 464.

On February 21, 2019, Aubrey was hospitalized at Lewis Gale Hospital after a Valium overdose. R. 434. Aubrey was discharged on February 27, 2019, in an improved and stable

condition. *Id*. Aubrey reported he experienced multiple panic attacks at work and "wanted to fix [himself]" and believed such episodes were caused by "stress, stress, stress and more stress." *Id*. Aubrey was diagnosed with generalized anxiety disorder with panic attacks and major depressive disorder, recurrent, severe without psychosis. R. 433, 447. He was prescribed Zoloft and Lamictal. R. 433.

Following Aubrey's hospitalization due to his attempted to suicide in February 2019, Aubrey participated in counseling with Casey Henshaw, LPC, from March 2019 to September 2019. R 475–88. Aubrey attended three appointments during this time period, mainly discussing issues with a new romantic relationship. *Id*. Aubrey did not relay suicidal ideations during his counseling sessions. *Id*. Aubrey terminated counseling in October 2019 stating it may be difficult to continue regularly scheduled sessions due to his return to work in September 2019. R. 487. Aubrey also attended additional counseling sessions at New River Valley Community Services in 2019. R. 1007–40.

In March 2019, Aubrey had a three-month follow-up with Dr. Kaatz regarding his seizure disorder with subsequent events at work which were determined to be true seizure activity. R. 463. Aubrey was advised to continue following up with neurology and to remain out of work until his next visit  in April. *Id*. Aubrey's bipolar disorder was stable with medication. *Id*.

On March 21, 2019, Aubrey presented to the care of neurologist, Mohammed A. Bhatti, M.D., with Lewis Gale Physicians, regarding his seizure disorder. R. 550. To treat his seizure disorder, Aubrey was prescribed Keppra 500 mg twice a day for two weeks then increased to 750 mg twice a day. R. 551. Aubrey was advised to follow up in one month. *Id*.

On April 18, 2019, Aubrey presented for a follow-up appointment with Dr. Bhatti. Aubrey denied seizure episodes since his last appointment with Dr. Bhatti on March 21, 2019. R. 548.

Aubrey was advised to continue Keppra 750 mg twice a day and was informed not to drive until seizure-free for six months. R. 549.

On April 22, 2019, Aubrey presented for a follow up appointment with Dr. Kaatz regarding his seizure disorder. R. 462. Dr. Kaatz noted Aubrey had not had a seizure since early March. Dr. Kaatz advised Aubrey to remain out of work for six months since his last seizure and, in accordance with his neurologist's recommendation, that he not drive for six months and to avoid sharp objects and high-risk settings. *Id*. Upon physical examination, Aubrey was "[s]itting comfortably and [made] eye contact well[,]" and had a "[p]retty good range of affect, pretty good mood, [and] interacted appropriately." *Id*. Dr. Kaatz noted Aubrey was "[m]ore content today than he's been in quite some time." *Id*. Dr. Kaatz noted Aubrey's seizure disorder and bipolar disorder were maintained on medication. *Id*.

On June 21, 2019, Aubrey presented for a two-month follow up with Dr. Kaatz and Christina Whitt, F.N.P.-C regarding his seizure disorder. R. 461. Aubrey reported he had not experienced any seizures. *Id*. Aubrey was advised to remain on his current medication regimen and was to remain out of work until seen on September 8, 2019. *Id*.

In early-September, 2019, Aubrey presented for a follow-up appointment with Dr. Kaatz regarding his seizure disorder and bipolar disorder. R. 460. Aubrey was cleared to return to work full duty on September 9, 2019. *Id*. Aubrey reported he had not experienced any seizures. *Id*. Dr. Katz noted Aubrey's seizure disorder and bipolar disorder were stable on medication, and Aubrey was advised to follow up in six months. *Id*.

On September 24, 2019, Aubrey presented for a follow up appointment regarding his seizure disorder with neurologist Tracy M. Scott, PA-C at Lewis Gale Physicians. R. 544. Aubrey reported he had a breakthrough seizure episode three weeks prior to the appointment when he was

at work. R. 544. Prior to this appointment, Dr. Scott increased Aubrey's Keppra to a thousand milligrams twice daily. R. 546. Since the medication increase, Aubrey reported he had not experienced a seizure episode. R. 544.

On November 24, 2019, Aubrey presented to the emergency department at Wythe County Community Hospital due to experiencing two seizure episodes in the car. R. 490. Aubrey was initially unresponsive and breathing but awoke upon the attempt to remove him from the car. *Id*. After his initial intake, Aubrey experienced another seizure that lasted less than a minute and resulted in head pain. R. 494. A CT of the brain was performed which results showed no evidence of acute intracranial abnormality. R. 501. As there was no neurology consultant present at Wythe County Community Hospital, Aubrey was transported to Lewis Gale Medical Center. R. 495.

On November 24, 2019, Aubrey arrived at Lewis Gale Medical Center following transfer from Wythe County Community Hospital. R. 512. Aubrey had additional testing, including a brain MRI, which results were unremarkable. R. 513. Aubrey reported he experienced seizures once a month or so that were typically brief along with a very brief episode of feeling "drained and unreal." R. 524, 528. Aubrey was advised not to drive at least six months from his last seizure and until cleared by his neurologist and to avoid using sharp edged machines. R. 517. Aubrey was discharged on November 26, 2019.

On December 9, 2019, Aubrey had an appointment regarding his seizure disorder with neurologist, Tracy M. Scott, PA-C at Lewis Gale Physicians. R. 540. Aubrey reported confusion about his medication and was taking only 25mg of Lamictal twice daily, instead of 200mg twice daily. Aubrey was instructed on how to titrate the medication up to 200 mg twice a day. *Id*. Aubrey reported stress was a trigger for his seizures. R. 542. Aubrey denied any new seizure episodes since November 26, 2019. R. 540. Aubrey was advised to follow-up in four weeks. R. 542.

On January 8, 2020, Aubrey was checking in for a follow-up appointment for his seizure disorder with Dr. Kaatz when he experienced two seizures and was transported to Lewis Gale Hospital for a post-seizure evaluation. R. 932, 2192. Aubrey's evaluation and testing were unremarkable. R. 927–34. Aubrey was released the same day and was advised to follow up with his neurologist and primary care physician. *Id*.

On January 13, 2020, Aubrey had a follow-up appointment regarding his seizure disorder with Tracy M. Scott, PA-C, at Lewis Gale Physicians. R. 536. Aubrey reported that on January 8, 2020, he experienced four seizures in twenty-four hours. R. 537. Aubrey stated the seizures were very brief and he did not experience any convulsive behavior, bowel or bladder incontinence or tongue biting. R. 536. Aubrey was continued on Lamictal and Keppra and was referred to a neurosurgeon. R. 538.

On January 14, 2020, Aubrey continued care at New River Valley Community Services. R. 1045. Aubrey reported he was feeling more anxious and was having issues sleeping. *Id*. Aubrey was restless and fidgety during his appointment, and his thoughts were tangential and often difficult to follow. *Id*. Aubrey reported increased anger towards others and nervousness regarding his medical issues. *Id*.

On January 17, 2020, Aubrey was transported to the emergency department at Lewis Gale Medical Center after reportedly experiencing eight seizures during the prior twenty-four hours. R. 690. Aubrey was initially transported to Twin County Regional Hospital on January 16, 2020, after hitting his head during a seizure episode. *Id*. Aubrey had a normal examination and unremarkable testing. *Id*. Aubrey was stable during his time at the hospital and was discharged with the instructions to follow up with his psychologist and primary care physician to treat his pseudoseizures. *Id*.

On February 12, 2020, Aubrey attended a counseling session at New River Valley Community Services. R. 1054. Aubrey continued to claim increased anger, but stated he was attempting to relax by "keeping himself busy" by drawing, spending time with his girlfriend and working on his house. *Id*. Aubrey reported he was experiencing approximately four seizures a week. *Id*.

On February 18, 2020, Aubrey reported to the emergency department at Lewis Gale Hospital due to a seizure episode and lingering dizziness. R. 910, 916. Aubrey had a normal examination and unremarkable testing. R. 916. He was discharged the same day. *Id*.

On February 20, 2020, Aubrey had a follow-up appointment regarding his seizure disorder with his primary care physician, Dr. Kaatz. R. 1156. Aubrey reported he experienced four seizures over the past month. *Id*. He complained of decreased sleep and left-sided numbness and tingling. *Id*. Aubrey stated his mood was stable, but he typically became more irritable after a seizure. *Id*. Aubrey's physical examination was normal, and he exhibited normal orientation, affect, and mood. R. 1157. Dr. Kaatz diagnosed Aubrey with anxiety, syringomyelia, and seizure disorder. *Id*. In May 2020, Aubrey reported he had not experienced seizures since January 2020. R. 1151. Aubrey continued regular appointments for medication with Dr. Kaatz throughout 2020.

On March 4, 2020, Aubrey attended a counseling session at New River Valley Community Services. R. 1062. He reported issues of "mini panic attacks" and claustrophobia when in small areas with a lot of people in them. *Id*. Aubrey also reported he only had one seizure since Valentine's Day and was taking new sleep mediation, which he believed was helping his seizures. *Id*. He attended a counseling session on March 18, 2020, and he had not experienced a seizure since his last session. R. 1066. Aubrey reported he was "feeling good" and noticed a decrease in his obsessive-compulsive disorder symptoms. *Id*. Aubrey reported he continued to engage in

drawing, construction and painting of his house, watching TV, talking to his girlfriend and friend, and "fixing things" as ways to de-stress. *Id*. On April 15, 2020, Aubrey had a counseling session and he reported he had not experienced any seizures since his last appointment. R. 1070. Aubrey continued with his daily activities to decrease stress. *Id*.

On June 16, 2020, Aubrey presented to Lewis Gale Hospital due to a reported overdose. R. 1280. Aubrey reported he had a headache and took four to six Tylenol and his usual dose of Keppra and Atarax. *Id*. Aubrey denied suicidal ideations and stated he believed he experienced a seizure. *Id*. He denied head trauma, but experienced tongue biting or having bowel or bladder incontinence. *Id*. Upon examination, he was alert and oriented. *Id*. All examinations and testing were unremarkable, and Aubrey was discharged in stable condition. R. 1287.

On June 30, 2020, Aubrey attended a counseling session at New River Valley Community Services and reported an increase in stressors and seizures stating he experienced around eight seizures since April. R. 1083. Aubrey continued regular visits during 2020 reporting some periods of stress and others where he was feeling better, as well as times where he experienced some or no seizures. *See* R. 1087–1136.

On July 17, 2020, Aubrey presented to the care of neurologist Mark Quigg, M.D., at UVA Primary Care Center in the Epilepsy Monitoring Unit. R. 975–78. His appointment was for a second opinion related to his seizure disorder. R. 976. Aubrey described seizure-like spells lasting for up to one minute and provided that he often had vertigo before progressing to shaking in all extremities and bilateral paresthesia. R. 977. Aubrey stated he was exhausted for several hours after these episodes and endorsed stress as a frequent trigger. *Id*. During examination, Aubrey was alert, oriented, fluent, and cognitively intact, and exhibited normal mood and affect, movement, strength, tone, bulk, and gait and coordination. *Id*. Dr. Quigg indicated Aubrey experienced

medically intractable spells that have a panic-attack phenotype. R. 978. Dr. Quigg ordered an EEG which results were normal. R. 976, 978.  It was determined that Aubrey's episodes were non-epileptic in origin. R. 952.

On September 23, 2020, Aubrey presented to the care of his primary care physician, Dr. Kaatz, reporting he had two seizures while at work that morning. R. 1265. Aubrey reported he did not want to attend the medical appointment, but he was asked to get "checked out" after he fell into the arms of a coworker during his seizure episode. *Id*. Aubrey reported he recently started back at work one week prior. *Id*. Aubrey's seizures did not result in injury, his neurological examination was normal, and he was discharged with the approval to return to work. R. 1271.

On September 25, 2020, Aubrey presented to Lewis Gale Hospital with anxiety and seizure-like behavior. R. 1258. Aubrey's physical examination was normal, including normal gait, sensation, strength, and coordination, but appeared disheveled and had minimal eye contact with slow speech and a flat mood and affect. R. 1262. After approximately ten minutes, Aubrey requested discharge as he stated his seizure was "over now." *Id*.

On October 21, 2020, Aubrey presented for a routine follow-up appointment with Dr. Quigg at the UVA Primary Care Center in the Epilepsy Monitoring Unit. R. 946–47. Aubrey was alert, oriented, fluent and well kempt with appropriate mood and affect. R. 947. Dr. Quigg discussed Aubrey's diagnosis of psychogenic nonepileptic seizures ("PNES"), noting he thought he would do well once he was able to see his psychiatrist and regulate his depression management. *Id*.  As Aubrey's seizures were no longer neurological in nature, Dr. Quigg discharged Aubrey from the clinic. *Id*.

On February 4, 2021, Aubrey had a follow-up appointment with Dr. Kaatz. R. 1176. Aubrey reported he was doing fine but had a few seizures within the last month. R. 1177. Aubrey

had normal gait and station, sensation, coordination, strength and tone, and was alert and oriented with normal mood, speech, thought content, memory, intelligence, concentration, and judgment. R. 1178. Aubrey's psychosomatic pseudoseizures were noted to be stable. R. 1179.

On March 29, 2021, Aubrey met with his counselor at New River Valley Community Services. R. 1199. Aubrey reported he had some "bad weeks" identifying he was isolating himself more, feeling a lack of motivation, difficulty concentrating, difficulty completing one task before moving to the next, difficulty falling asleep and getting to deep sleep, having weird dreams, and losing interest in things he usually enjoyed doing. *Id.* Aubrey was diagnosed with somatoform disorder, major depressive disorder, and obsessive-compulsive disorder. *Id.* In April and May, Aubrey reported increased stressors due to familial issues and difficulty sleeping, but improved depression. R. 1207, 1210, 1215.

On April 2, 2021, Aubrey attended an appointment with Anthony Ramsey, NP, a nurse practitioner for Dr. Kaatz. R. 1320–22. Aubrey reported he experienced a seizure on March 31 which he described as a headache, then "jerking" of his body. R. 1321. Aubrey claimed he was tired, slept for one hour after the episode, and then woke up. *Id.* Aubrey reported his bipolar disorder, anxiety, and insomnia were controlled with medication. *Id.* Aubrey's physical examination was normal, and he exhibited appropriate affect, mood, insight, attention, and concentration. *Id.* His medication regimen was continued as previously prescribed. R. 1322. Aubrey attended follow-up appointments in May and June where he reported no seizures and stable condition of his seizure disorder, anxiety, and bipolar with medication. R. 1315–19.

Aubrey continued regular appointments at New River Valley Community Services in 2022. In February 2022, Aubrey appeared overwhelmed as he was caring for his grandparents. R. 1786. He discussed stressors related to his finances and managing stress levels to avoid seizures. *Id*. In

March 2022, Aubrey reported a difficult few months due to caring for his sick grandfather. R. 2142. Aubrey reported one seizure since January 2022. *Id.* Aubrey reported his sleep improved but was getting angry easily due to stress of caring for his grandfather. R. 2143. His mental status examination was normal, and he engaged well and maintained appropriate eye contact during the appointment. R. 2143, 2145. Aubrey's diagnoses remained the same in March and April, including somatic symptom and conversion disorders, and major depressive disorder. R. 2143.On April 21, 2022, it was noted Aubrey was making good progress towards his goals and had no seizures since late January/February. R. 2152. Aubrey reported he had a seizure "in his sleep," but when questioned he stated he "dreamt he was seizing and woke up." *Id.*

On May 3, 2022, Aubrey had a follow-up appointment with Dr. Kaatz. R. 2174. Aubrey was alert and oriented and exhibited a good mood and good range of affect. *Id*. Dr. Kaatz noted it was "the best [he had] seen him in quite some time." *Id*.

### C. Medical Opinion Evidence

On April 9, 2021, state agency medical consultant Joseph Leizer, Ph.D., as part of the initial disability determination, reviewed Aubrey's record and provided a mental RFC assessment. R. 224–25. Dr. Leizer found that Aubrey had no limitations in understanding, remembering, or applying information and moderate limitations in interacting with others; concentrating, persisting or maintaining pace; and managing himself. *Id*. He found that Aubrey could complete simple, short tasks and work in close proximity to others; perform simple, routine work; adapt to low interpersonal contact; frequently make simple decisions and exercise appropriate judgment without special supervision; and would need advanced notice of changes in routine or processes due to his anxiety. R. 225. On October 25, 2021, state agency medical consultant Sreeja Kadakkal, M.D., as part of the reconsideration stage, agreed with Dr. Leizier's findings. R. 233, 236–37.

17

On July 19, 2021, Alana Chandler, LPC/ATR, and Lindsey Kennedy, NP, both of New River Valley Community Services, filled out a joint mental impairment questionnaire. R. 1372–74. As for Aubrey's mental abilities and aptitudes needed to do unskilled work, they opined that Aubrey had marked limitations in completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, and dealing with normal work stress, and mild limitations in maintaining attention for two-hour segments. R. 1373. As for Aubrey's mental abilities and aptitudes needed to do semiskilled and skilled work, they opined that Aubrey had marked limitations in dealing with stress of semiskilled and skilled work. *Id*. As for Aubrey's mental abilities and aptitude needed to do particular types of jobs, they opined Aubrey had marked limitations in traveling to unfamiliar places and mild limitations in using public transportation. *Id*.

As for functional limitations, they opined Aubrey had marked limitations in restrictions of daily activities, moderate limitations in difficulties in maintaining social functioning and deficiencies of concentration, persistence, or pace, and would experience four or more repeated episodes of decompensation within a twelve-month period. R. 1374. They opined Aubrey would be absent more than four days per month, on average, due to his impairments or treatment. Id. They provided the following statement in support of their opinion: "Aubrey's seizures are stress and anxiety induced causing difficulty in focus and ability to consistently carry out job duties. He also has several medical appointments he must attend." *Id*. They provided the limitations related back to March 7, 2019, the alleged disability onset date. *Id*.

A second mental impairment questionnaire dated July 19, 2021, was completed by Ms. Chandler and Ms. Kennedy. R. 2135–37. The opinions provided in the questionnaire are similar to the above, but provide for more severe limitations, including the following: moderate limitations

18

in getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes and understanding and remembering detailed instructions; marked limitations in accepting instructions and responding appropriately to criticism from supervisors, dealing with normal work stress, carrying out detailed instructions, setting realistic goals or making plans independently of others, and maintaining social functioning; and extreme limitations in responding appropriately to changes in a routine work setting and deficiencies in concentrating, persisting and maintaining pace. *Id*. They provided the following statement in support of their opinion: "Aubrey experiences approximately two seizures per month due to difficulty managing anxiety [and] stress. He has difficulty focusing and carrying out job duties." R. 2137. On March 22, 2022, Ms. Chandler and Ms. Kennedy confirmed their opinions had not changed since providing the initial questionnaires in July 2021. R. 2134.

On October 11, 2021, Matthew Kaatz, M.D., and Anthony Ramsey, NP, completed a Seizures Residual Functional Capacity Questionnaire. R. 1674–78. They opined Aubrey met the listing for Epilepsy (Listing 11.02). R. 1674. They noted Aubrey suffers from "seizures/pseudoseizure/psychogenic nonepileptic seizure (PNES)," and personally observed Aubrey experience a seizure that included "tonic-clonic movements of upper and lower extremities with spastic deviation of head/neck with postictal state . . . ." R. 1675. Based upon Aubrey's reports, they noted Aubrey experienced one to four seizures per month that occur without warning, caused by stress, include loss of consciousness, and typically last for ten minutes. R. 1675–76. During the postictal state, Aubrey experiences confusion, exhaustion, and muscle strain. R. 1676. They provided that Aubrey's seizures are likely to disrupt the work of co-workers and require more supervision than unimpaired workers. R. 1677. They opined Aubrey is incapable of even "low stress" jobs and that such a job would increase the frequency of Aubrey's seizures. *Id*. They also

opined Aubrey would be absent more than four days per month due to his impairments or

treatment. *Id*.  They confirmed the opinions relate back to March 17, 2019. R. 1678. On May 12,

2022, Dr. Kaatz confirmed his opinions regarding Aubrey's limitations remained the same from

his October 11, 2021 questionnaire. R. 2181–86.

## ANALYSIS

### I.    Additional Evidence Submitted to the Appeals Council

Aubrey asserts remand is appropriate due to the Social Security Administration's Appeals

Council's failure to properly consider additional evidence regarding his seizures. ECF No. 12 at

5. Specifically, following the ALJ's September 8, 2022 decision to deny Aubrey benefits, Aubrey

submitted additional treatment records from New River Medical Group dated April  28, 2022

through July 1, 2022 and December 28, 2022 through January 10, 2023, R. 92–115, 211–16, and

New River Valley Community Services dated May 2, 2022 through September 1, 2022 and

September 12, 2022 through March 28, 2023, R. 85–91, 116–210, to the Appeals Council. The

Commissioner claims that remand is not appropriate as Aubrey failed to satisfy his burden of

showing that the evidence was new, material, and there was a reasonable probability such evidence

would change the outcome of the ALJ's decision. ECF No. 14 at 17–18 n. 4. The Commissioner

claims the additional evidence is "more of the same" regarding Aubrey's seizures and, thus, would

not alter the ALJ's decision.

The Appeals Council ultimately denied Aubrey's request for review and adopted the ALJ's

opinion as the final decision of the Commissioner. R. 1–4. In so doing, the Appeals Council

considered the additional treatment records but found that they did not provide a basis for changing

the ALJ's decision. R. 2. Regarding the treatment records that pre-dated the ALJ's decision, the

Appeals Council found the evidence did not show a reasonable probability that they would change

20

the outcome of the decision. *Id*. The Appeals Council found that the treatment records that post-dated the ALJ's decision did not relate to the period at issue and, thus, would not affect the ALJ's decision whether Aubrey was disabled beginning on or before September 8, 2022. *Id*.

The first step in the appeals process where a claimant disagrees with the ALJ's decision is to seek review from the Appeals Council. *See* 20 C.F.R. § 404.977. One basis for review is if the "Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the [ALJ's] hearing decision, and there is a reasonable probability that the evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5). A claimant seeking Appeals Council review based on additional evidence must also demonstrate good cause for not informing the agency about or submitting the evidence at an earlier stage. 20 C.F.R. § 404.970(b). The Appeals Council is not required to "explain its rationale for denying review." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). However, remand is appropriate where the Appeals Council erroneously refuses to consider additional evidence. *See Boothe v. Berryhill*, 2018 WL 709978, at *9 (W.D. Va. 2018).

To start, Aubrey fails to provide *any* argument to support his contention that the additional evidence warrants remand. Rather, Aubrey provides that the additional evidence satisfies the applicable legal standard – i.e., that the additional treatment records are "new, material, and related to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence, if reviewed, would have changed the outcome of the decision." ECF No. 12 at 5 n. 2. Aubrey also fails to show "good cause" for not submitting the additional evidence at an earlier stage.

Upon review of the record, the court concludes the Appeals Council appropriately considered the submission of the additional evidence and determined that such evidence did not

warrant review of the ALJ's decision. Although the treatment records are "new" in that they were not part of the record as of the date of the ALJ's decision, such records fail to meet the materiality requirement because the records do not relate to the time period prior to the ALJ's decision and include mostly cumulative medical evidence regarding Aubrey's seizures that is already in the record. Further, upon review of the records, the Court is not convinced that the ALJ's decision would have been different had the additional records been before him. Specifically, the treatment providers' assessments of Aubrey's seizures, as well as Aubrey's own reports regarding the frequency of his seizures during such treatment sessions, largely coincide with the evidence considered by the ALJ, discussed below. In fact, some of the additional treatment records provide that Aubrey's seizure-like episodes continued to improve. On two occasions Aubrey reported his seizures were "[not] as frequent" and that he was "doing pretty good. I still have seizures, not all the time, they are not as bad as what they were . . . ." R. 125, 143.

Accordingly, the additional evidence submitted to the Appeals Council, though considered by the court, does not entitle Aubrey to remand.

**II.    The ALJ's RFC Analysis[6] & Step-Five Finding**

Aubrey claims the ALJ's determination regarding his RFC is not supported by substantial evidence. Aubrey argues the ALJ failed to: (1)  perform a proper function-by-function analysis, (2) explain how Aubrey's severe mental impairments are reflected in the RFC, including the failure to explain how Aubrey's RFC accommodates his "moderate" limitations in concentrating, persisting, or maintaining pace, and (3) explain the combined effects of Aubrey's "moderate" limitations in concentrating, persisting, or maintaining pace and his pseudoseizure disorder. *See* ECF No. 12 at 3–11. Aubrey additionally argues the ALJ failed to reconcile inconsistencies

---

[6] Aubrey's first two arguments pertain to the ALJ's RFC determination. Accordingly, I consider both arguments in this section.

between the jobs identified by the vocational expert and the limitations set forth in Aubrey's RFC. *Id*. at 6–9.

The ALJ is required to develop an adequate RFC that accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work. *See* SSR 96-8p, 61 Fed. Reg. at 34476 (July 2, 1996). An RFC assessment "is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id*. To comply with the function-by-function analysis, the ALJ must provide a narrative discussion describing "how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*.; *see also Mascio*, 780 F.3d. at 636.

The ALJ "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis" and detail "the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." SSR 96-8P, 61 Fed. Reg. at 34478; *see also Monroe*, 826 F.3d at 189. Ultimately, the ALJ must explain the conclusions reached and any inconsistencies or ambiguities in the evidence. *Id.*

Here, the ALJ's decision includes a narrative discussion as required by SSR 96-8p which provides sufficient information to allow meaningful review by the court. The ALJ cited objective medical evidence, such as Aubrey's medical history, R. 25–28, and nonmedical evidence, such as Aubrey's testimony and daily activities, *see* R. 21–32. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a narrative discussion explaining the conclusions he reached and any inconsistencies in the evidence. *See* SSR 96-8p, 61 Fed. Reg. at 34478; *see*, *e.g.*, R. 28 (The ALJ considered the evidence and found Aubrey's

23

statements regarding "the intensity, persistence, and limiting effects of his impairments []
inconsistent with the record.").

As it relates to Aubrey's pseudoseizure disorder, the ALJ outlined the relevant evidence
regarding his seizure-like episodes and then provided the following analysis:

> In 2019 and 2020, the claimant was in routine care with both his primary care
> provider and a neurologist for pseudo-seizures (Exhibits 2F, 6F, 14F, 15F). Records
> show the claimant often stated he was doing well and denied symptoms, including
> visual disturbances, headaches, and dizziness. His providers also noted he was
> doing well on his prescribed medications (Exhibits 2F, 6F, 40F). While the claimant
> did go to the hospital in March of 2019, September of 2019, January of 2020, and
> September of 2020, he was discharged in stable condition and had no significant
> abnormalities while at the hospital (Exhibits 7F, 8F, 9F, 11F). In 2021 and 2022,
> the claimant began to show symptom improvement. The record contains no
> associated hospitalizations, and the claimant's provider noted he had no recent
> episodes and his disorder was stable (Exhibit 21F). In 2022, his provider indicated
> he was doing very well (Exhibit 38F).

R. 28. Aubrey claims the ALJ failed to explain how he reached the conclusion in the RFC that
Aubrey may incur "up to two days per month unscheduled absences." ECF No. 12 at 7. However,
the above narrative description assessing the improvement in Aubrey's seizure-like episodes
during the relevant period, along with the summary of the medical evidence regarding Aubrey's
seizure-like episodes, Aubrey's testimony, and the medical opinion evidence, provides a logical
bridge between the evidence and the ALJ's conclusion that Aubrey may incur up to two
unscheduled absences.

In further objecting to the ALJ's RFC determination, Aubrey claims the ALJ failed to
specifically explain how Aubrey's severe mental impairments are reflected in the RFC. ECF No.
12 at 5–6. This argument is unavailing. The ALJ properly considered the medical and non-medical
evidence in the record regarding Aubrey's severe mental impairments, appropriately found
limitations regarding Aubrey's severe mental conditions, and included such limitations in the RFC,
concluding the following:

> He has concentration, persistence, and pace adequate for performing simple, routine (non-complex) tasks. He can occasionally interact with supervisors and coworkers but can have no requirements for public interaction. Due to the overall impact of his impairments, he may fall off-task up to 15% of the workday apart from regularly scheduled breaks and may incur up to two days per month unscheduled absences.

R. 24. It follows from the narrative discussion regarding the record evidence that the above portion of Aubrey's RFC addresses, in part, his severe mental limitations.

In his analysis, the ALJ noted that Aubrey's treatment records from his treating practitioners "usually showed that [Aubrey's] mental status was normal at appointments" and he typically had "normal orientation, speech, thought content and process, insight, judgment, memory, and concentration." R. 29. In summarizing this portion of Aubrey's treatment records, the ALJ noted that he "would expect that his treating practitioners would note abnormalities on mental status examinations" if Aubrey suffered from significant mental symptoms, such as poor memory, concentration, and social functioning. *Id.*

In analyzing the medical opinions, specifically the opinions of Sreeja Kadakkal, M.D. and Joseph Leizer, Ph.D. regarding Aubrey's mental limitations, the ALJ specifically noted that he "included additional time off-task" and modified Aubrey's RFC to address mental limitations based upon Aubrey's testimony at the May hearing and new evidence in the record.[7] I find that such narrative discussion included in the ALJ's opinion regarding Aubrey's mental limitations

---

[7] Aubrey contends the ALJ failed to explain how he arrived at the limitations in Aubrey's RFC concerning interaction with supervisors, coworkers, and the general public. ECF No. 12 at 7 n. 4. This argument is also unavailing. I find that the ALJ sufficiently analyzed the evidence regarding Aubrey's limitations in interacting with others to reach the limitation provided in Aubrey's RFC. *See* R. 22–23, 29–30. In fact, the ALJ appears to have given weight to Aubrey's testimony regarding issues with interacting with others – "At hearing, [Aubrey] described difficulty going out in public and being around others. He endorsed irritability and trouble getting along with family members during therapy visits." R. 23. As noted by the ALJ, Aubrey's testimony contrasts with Aubrey's treatment records which note normal interactions during appointments. R. 29. In evaluating the medical opinions regarding Aubrey's mental limitations, the ALJ confronted the inconsistencies in the medical evidence and Aubrey's testimony on this issue and confirmed that he modified the RFC "to accommodate [Aubrey's] testimony" at the hearing. R. 30. Accordingly, I find that ALJ provided sufficient analysis to reach the conclusion regarding Aubrey's limitations in interacting with supervisors, coworkers, and the general public.

provides the necessary bridge from the evidence to the ALJ's conclusions and, ultimately, his RFC determination. Accordingly, remand is not warranted on this issue.

Aubrey also claims the ALJ's opinion is at odds with *Mascio* as he failed to provide an explanation for how or why he reached the conclusion regarding Aubrey's RFC that he "has concentration, persistence, and pace adequate for performing simple, routine (non-complex) tasks." ECF No. 12 at 9–11.

In *Shinaberry v. Saul*, 952, F.3d 113 (4th Cir. 2020), the Fourth Circuit confirmed that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" *Shinaberry*, 952 F.3d at 121 (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)). Nevertheless, *Mascio* does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Id.* In contrast, *Shinaberry* highlights "sister circuits" which conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). *Shinaberry* further confirms that *Mascio* simply emphasizes the ALJ's duty to adequately review the evidence and explain his decision.

Aubrey's claim that the ALJ's decision is not in accordance with *Macio* is incorrect. Unlike the issue in *Mascio*, where the hypothetical did not address the claimant's mental limitations and the RFC finding limited the claimant to only "unskilled work," *Mascio*, 780 F.3d at 637–38, the hypothetical used by the ALJ and the RFC finding also address Aubrey's ability to stay on task,

as opposed to just his ability to perform simple tasks. As discussed above, the ALJ specifically included a limitation regarding Aubrey's ability to stay on task, concluding that he would likely be off-task 15 percent of the workday apart from regularly scheduled breaks.

Aubrey further claims the ALJ failed to discuss whether or how Aubrey's pseudoseizure disorder might exacerbate Aubrey's limitations in terms of concentrating, persisting or maintaining pace. *Id*. As stated by the Fourth Circuit, "[i]t is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render [a] claimant unable to engage in substantial gainful activity." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Where a claimant has multiple impairments, the ALJ must consider the combined effect of those impairments in determining whether the claimant is disabled. *Id*.; 20 C.F.R. § 404.1523. However, "an ALJ need not explicitly state that he or she has considered a claimant's impairments in combination. What matters is whether it is discernible from the ALJ's decision that he or she did so." *Jones v. Astrue*, 2011 WL 1877677, at *12 (W.D. Va. May 17, 2011).

This argument is also unavailing. It is clearly discernible from the ALJ's decision that he considered Aubrey's impairments in combination. In fact, although not required as noted in *Jones*, the ALJ specifically highlights that he considered the totality of Aubrey's impairments, stating in the RFC that "[d]ue to the overall impact of [Aubrey's] impairments, he may fall off-task up to 15% of the workday apart from regularly scheduled breaks and may incur up to two days per month unscheduled absences." R. 24 (emphasis added). Further, as shown by the evidence and considered by the ALJ, Aubrey's mental health diagnoses and his pseudoseizure disorder improved in 2021 and 2022 with counseling and medication. R. 26–28. As Aubrey testified, and as shown in the treatment records, Aubrey's seizure episodes relate to and are caused by stress for which Aubrey

27

seeks mental health counseling to help treat along with his mental health conditions. Accordingly, I find it is clear from the ALJ's analysis of the evidence that the RFC appropriately addresses the correlation of Aubrey's diagnoses and their cumulative effect on his limitations. In sum, the ALJ properly considered the combined effect of Aubrey's impairments in finding that he was not disabled.

Lastly, Aubrey claims the ALJ erred in finding a significant number of jobs existed in the national economy that Aubrey could perform based on the vocational expert's testimony that an individual could not "consistently" miss two days of work per month or experience one to four seizure episodes per month and maintain employment. *See* ECF No. 12 at 6–9.

At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that "exist[s] in significant numbers in the national economy," considering the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1560(c). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Mascio*, 780 F.3d at 635; *see also* 20 C.F.R. § 404.1566(e).[8]

As discussed further above, the ALJ engaged in a comprehensive review and analysis of the record evidence and found that Aubrey had particularized limitations included within his RFC regarding off-task time and absences to account for his pseudoseizures and mental impairments. As for absences, the ALJ's RFC determination includes the limitation that Aubrey "<u>may</u> incur up to two days per month unscheduled absences." R. 24 (emphasis added). The vocational expert testified that "[u]nskilled workers are generally not offered more than two days a month" for

---

[8] A hypothetical question is proper if it adequately reflects a claimant's RFC for which the ALJ had sufficient evidence. *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). The hypothetical the ALJ posed here meets this standard. *See* R. 75–78.

unscheduled absences, and if unskilled workers "<u>consistently</u> miss two days a month . . . employment <u>could be</u> in question." R. 76 (emphasis added). Aubrey misconstrues the vocational expert's testimony by claiming an inconsistency between such testimony and Aubrey's RFC. Rather, such RFC determination regarding the *possibility* – not a guarantee – of two absences per month is in accordance with the record evidence and the vocational expert's testimony.

In consideration of the above arguments, I find that substantial evidence supports the ALJ's RFC determination and ultimate determination that Aubrey is not disabled and, thus, not entitled to disability insurance benefits.

### III.    Medical Opinions

Aubrey claims the ALJ failed to adequately consider the medical opinions of Alana Chandler, LPC/ATR, and Lindsey Kennedy, NP, both of New River Valley Community Services, and Aubrey's primary care physician, Matthew Kaatz, M.D.

Because Aubrey applied for disability benefits on or after March 27, 2017, the ALJ applied the new social security regulations for evaluating medical opinions. *See* R. 29–32 (citing 20 C.F.R. § 404.1520c). Under the new regulations, the ALJ may not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." 20 C.F.R. § 404.1520c(a). Rather, the ALJ must consider the persuasiveness of all medical opinions in the record using five factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict a medical opinion. *See* 20 C.F.R. § 404.1520c(c).

Although an ALJ may consider all five factors, "the most important factors" are supportability and consistency. 20 C.F.R. § 404.1520c(a), (b)(2). The supportability factor focuses on the information relied upon and explanation provided to endorse the medical source's

findings: "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1). The consistency factor, on the other hand, compares the source's findings to evidence from other sources: "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 404.1520c(c)(2). The ALJ must explain in his decision how he considered the supportability and consistency factors for each medical opinion in the record. 20 C.F.R. § 404.1520c(b)(2). The ALJ may, but is not required to, explain how he considered the other three factors. *Id*.

As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes v. Kijakazi*, 70 F.4th 207, 214 (4th Cir. 2023), is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition, *see id*. at 212–13. When the court is "'left to guess' as to how the ALJ reached [his] evaluation of the conflicting medical opinions in light of the evidence of record," then it cannot "review the reasonableness of [his] conclusions." *Testamark v. Berryhill*, 736 F. App'x 395, 398 (4th Cir. 2018). The current regulation is more flexible than its predecessor, which required ALJs to evaluate "treating source" medical opinions under a special two-part standard and to explicitly consider each of five regulatory factors when assigning specific weight to every medical opinion in the claimant's record. *See*, *e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir. 2021) (citing 20 C.F.R. § 404.1527(c) (2016)).

The ALJ's evaluations of the medical opinions of Alana Chandler, LPC/ATR, and Lindsey Kennedy, NP, both of New River Valley Community Services, and Aubrey's primary care physician, Matthew Kaatz, M.D., were proper. The ALJ appropriately considered the

supportability and consistency factors of the opinions and provided sufficient analysis to reach the conclusion that their opinions were unpersuasive. For example, as noted by the ALJ, for the opinions at issue, each was provided in a "check-box format, with limited supporting information." R. 31. Such "check box form assessment[s]" are not generally entitled to great weight. *See Redman v. Saul*, 2020 WL 3107896, at *10 (W.D. Va. Jan. 28, 2020); *Walker v. Colvin*, 2015 WL 5138281, at *8 (W.D. Va. Aug. 31, 2015) (checkbox forms are of limited probative value). As for the consistency factor, the ALJ also noted that such opinions were inconsistent with the record evidence, as discussed in more detail earlier in the ALJ's opinion, and, as for Dr. Kaatz, such opinion was inconsistent with other medical evidence, including his *own* treating records. R. 31. The reasons given by the ALJ for finding the opinions of Dr. Kaatz, Alana Chandler, LPC/ATR, and Lindsey Kennedy, NP, unpersuasive are adequately explained, in accordance with the applicable regulations, and are supported by substantial evidence. As the Court is not "left to guess" on how the ALJ reached his conclusion that the opinions are unpersuasive, remand is not warranted on this issue.

## CONCLUSION

For the foregoing reasons, I find there is substantial evidence to support the Commissioner's decision. Therefore, I respectfully recommend that the presiding District Judge **AFFIRM** the Commissioner's final decision denying Aubrey's DIB claim and **DISMISS** this case from the Court's active docket.

## NOTICE TO PARTIES

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual

recitations or findings, as well as to the conclusion reached by the undersigned, may be construed

by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  August 8, 2024

C. Kailani Memmer
United States Magistrate Judge